# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

TULSI GABBARD and TULSI NOW, INC.,

                Plaintiffs,

      v.

HILLARY RODHAM CLINTON,

                Defendant.

Civil Action No. 20-cv-558

## DEFENDANT HILLARY RODHAM CLINTON'S MEMORANDUM OF LAW IN SUPPORT OF HER MOTION TO DISMISS THE FIRST AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM

David E. Kendall (Bar No. DK8983)
Katherine M. Turner (*pro hac vice*)
Amy Mason Saharia (*pro hac vice*)
Gloria K. Maier (*pro hac vice*)

WILLIAMS & CONNOLLY LLP
725 Twelfth Street N.W.
Washington, DC 20005

650 Fifth Avenue
Suite 1500
New York, NY 10019
Tel: (202) 434-5000
Fax: (202) 434-5029

*Counsel for Hillary Rodham Clinton*

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

BACKGROUND .........................................................................................................2

STANDARD OF REVIEW .........................................................................................6

ARGUMENT ..............................................................................................................7

I.      "Favorite of the Russians" and "Russian Asset" Are Non-Actionable Statements
        of Opinion ...................................................................................................8

II.     Plaintiffs Fail To Satisfy the "Of and Concerning" Requirement .....................................14

III.    Plaintiffs Fail To Allege That Secretary Clinton Acted with "Actual Malice" .................16

CONCLUSION ..........................................................................................................20

# TABLE OF AUTHORITIES

## CASES

*Adirondack Record v. Lawrence*, 202 A.D. 251 (N.Y. App. Div. 1922).......................................15

*Afftrex, Ltd. v. Gen. Elec. Co.*, 161 A.D.2d 855 ( N.Y. App. Div. 1990).....................................15

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009).....................................................................................6, 7

*Biro v. Conde Nast,* 807 F.3d 541 (2d Cir. 2015).......................................................16, 18, 19, 20

*Biro v. Conde Nast*, 963 F. Supp. 2d 255 (S.D.N.Y. 2013), *aff'd*, 807 F.3d 541 (2d Cir.) ...........18

*Buckley v. Littell*, 539 F.2d 882 (2d Cir. 1976).................................................................8, 9, 13,14

*Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam) ........................................................................7

*Carlucci v. Poughkeepsie Newspapers, Inc.*, 442 N.E.2d 442 (N.Y. 1982) .................................15

*Chaiken v. VV Publ'g Corp.*, 907 F. Supp. 689 (S.D.N.Y. 1995) .................................................19

*Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087 (4th Cir. 1993)........................................................7

*Chau v. Lewis*, 771 F.3d 118 (2d Cir. 2014)................................................................8, 10, 13, 14

*Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253
(S.D.N.Y.)....................................................................................................................2, 3

*Church of Scientology Int'l v. Behar*, 238 F.3d 168 (2d Cir. 2001) ................................15, 17, 20

*Church of Scientology Int'l v. Time Warner, Inc.*, 1998 WL 575194 (S.D.N.Y. Sept. 9,
1998), *aff'd sub nom. Church of Scientology Int'l v. Behar*, 238 F.3d 168 (2d Cir.
2001) ............................................................................................................................20

*Connelly v. Nw. Publ'ns, Inc.*, 448 N.W.2d 901 (Minn. Ct. App. 1989).......................................18

*Davis v. Boeheim*, 22 N.E.3d 999 (N.Y. 2014)...........................................................................10

*Egiazaryan v. Zalmayev*, 880 F. Supp. 2d 494 (S.D.N.Y. 2012)..........................................9, 12, 13

*Farah v. Esquire Mag.*, 736 F.3d 528 (D.C. Cir. 2013) ..................................................................7

*Garrison v. Louisiana*, 379 U.S. 64 (1964) ................................................................................17

*Giraldo v. Kessler*, 694 F.3d 161 (2d Cir. 2012) .........................................................................2

*Greenbelt Coop. Publ'g Ass'n, Inc. v. Bresler*, 398 U.S. 6 (1970)...........................................9, 18

*Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657 (1989) .......................................17, 18, 19

*Hawaii v. Trump*, 859 F.3d 741 (9th Cir.), *vacated on other grounds*, 138 S. Ct. 377 (2017)....................................................................................................................................3

*Immuno AG v. Moor-Jankowski*, 567 N.E.2d 1270 (N.Y. 1991)................................................11

*Julian v. Am. Bus. Consultants, Inc.*, 137 N.E.2d 1 (1956) ........................................................8

*Kirch v. Liberty Media Corp.*, 449 F.3d 388 (2d Cir. 2006)......................................................15

*Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005)........................................................................4

*Koch v. Goldway*, 817 F.2d 507 (9th Cir. 1987)....................................................................9, 11

*Levin v. McPhee*, 119 F.3d 189 (2d Cir. 1997)..........................................................................14

*Liberty Lobby, Inc. v. Rees*, 852 F.2d 595 (D.C. Cir. 1988) .....................................................20

*Masson v. New Yorker Mag., Inc.*, 501 U.S. 496 (1991) ...........................................................17

*Michel v. NYP Holdings, Inc.*, 816 F.3d 686 (11th Cir. 2016) ...........................................7, 10, 12

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990)..............................................................8, 12

*Monitor Patriot Co. v. Roy*, 401 U.S. 265 (1971)....................................................................1, 17

*N.J. Carpenters Health Fund v. Royal Bank of Scot.*, 709 F.3d 109 (2d Cir. 2013) .....................4

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964)............................................................... *passim*

*National Ass'n of Gov't Emps. v. Cent. Broad. Corp.*, 396 N.E.2d 996 (Mass. 1979)................11

*Ocala Star-Banner Co. v. Damron*, 401 U.S. 295 (1971) .........................................................17

*Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264 (1974)................................................................................................................................9, 12

*Ollman v. Evans*, 750 F.2d 970 (D.C. Cir. 1984) ............................................................8, 11, 14

*Rosenblatt v. Baer*, 383 U.S. 75 (1966) ....................................................................................15

*St. Amant v. Thompson*, 390 U.S. 727 (1968)...........................................................................17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).............................................2, 4

*Weyrich v. New Republic, Inc.*, 235 F.3d 617 (D.C. Cir. 2001) .............................................9, 10

*White v. Fraternal Order of Police*, 909 F.2d 512, 520 (D.C. Cir. 1990) ...................................19

*Wood v. AFGE*, 316 F. Supp. 3d 475 (D.D.C. 2018), *aff'd*, No. 18-7124, 2019 WL
 668337 (D.C. Cir. Feb. 12, 2019) ...............................................................................9

**OTHER**

First Amendment of the United States Constitution ............................................. *passim*

Fed. R. Civ. P. 12(b)(6)...........................................................................................1, 2

Robert D. Sack, *Sack on Defamation* (5th ed. 2017).........................................7, 10, 17

## INTRODUCTION

Defendant and former Secretary of State Hillary Rodham Clinton hereby moves, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the amended complaint for defamation filed by Plaintiffs Tulsi Gabbard and Tulsi Now, Inc.  Plaintiff Gabbard is a member of Congress who recently suspended her campaign to become the Democratic Party nominee for the 2020 presidential election.  This lawsuit—which seeks $100 million in damages for a single passing remark made by Secretary Clinton in a 40-minute podcast interview about the 2020 election—is an effort by Rep. Gabbard to silence her political critics while making political headlines.  Rep. Gabbard's lawsuit reflects a disregard for the First Amendment's protection for free debate on matters of public concern—a protection that "has its fullest and most urgent application precisely to the conduct of campaigns for political office."  *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971).

Plaintiffs' amended complaint suffers from all of the same defects as the original complaint.  First, the allegedly defamatory statements cannot support a claim for defamation because they are statements of opinion on matters of public concern and are not provably false. As such, they are entitled to full constitutional protection.  Second, the key statement at issue does not satisfy the requirement that it be "of and concerning" either Rep. Gabbard or Tulsi Now.  Third, Plaintiffs fail sufficiently to allege that Secretary Clinton made any factual statements with actual malice—that is, with knowledge that they were false or with reckless disregard of their falsity.

Our "profound national commitment" to "robust" debate on public issues requires that citizens—public figures and private citizens alike—be free to participate in that debate without fear of being sued for defamation by candidates for public office who disagree with their viewpoints.  *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).  Secretary Clinton respectfully requests that this Court dismiss Plaintiffs' amended complaint with prejudice.

1

## BACKGROUND

Hillary Clinton—who has served the United States as Secretary of State and Senator—was the 2016 Democratic Party nominee for President of the United States.  Am. Compl. ¶ 16.  One fundamental question that emerged during and after the 2016 presidential election was whether the Russian government interfered in the election.  That question prompted investigations by both the legislative and executive branches into the extent of Russian interference in the 2016 presidential election, including Russia's use of social media to interfere with the election.[1]  A related issue was the impact of third-party candidates on the result of the 2016 election.[2]

---

[1] *See, e.g.*, Robert S. Mueller, III, Report On The Investigation Into Russian Interference In The 2016 Presidential Election, p. 1 (Vol. 1, March 2019), https://www.justice.gov/storage/report.pdf ("As set forth in detail in this report, the Special Counsel's investigation established that Russia interfered in the 2016 presidential election . . . .  [A] Russian entity carried out a social media campaign that favored presidential candidate Donald J. Trump and disparaged presidential candidate Hillary Clinton.").

The Court may take judicial notice of the fact of the Mueller investigation and the existence of its findings.  On a motion to dismiss, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Courts "'may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253, 261–62 (S.D.N.Y.) (quoting Fed. R. Evid. 201(b)), *aff'd*, 788 F. App'x 85 (2d Cir. 2019).  Courts may "take judicial notice of relevant matters of public record." *Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012).

[2] *See* Report of the Select Committee on Intelligence, United States Senate, on Russian Active Measures Campaigns and Interference in the 2016 U.S. Election, pp. 33–34 (Vol. 2), https://www.intelligence.senate.gov/sites/default/files/documents/Report_Volume2.pdf  (noting that certain Russian Internet Research Agency accounts focused their efforts at denigrating Secretary Clinton and supporting Green Party candidate Jill Stein).  Gary Johnson, the Libertarian Party nominee, won 3.28% of the popular vote, and Jill Stein, the Green Party nominee, won 1.07%.  *See* FEC Official 2016 Presidential General Election Results, *available at* https://transition.fec.gov/pubrec/fe2016/2016presgeresults.pdf.  The votes that Stein won in Michigan and Pennsylvania exceeded Trump's margin of victory in those states.  *See id.*

Tulsi Gabbard, a member of Congress who recently suspended her campaign for President, describes herself on her official campaign website as "an outspoken critic of regime change wars and the new cold war."[3]  In 2017, Rep. Gabbard traveled to Syria and met with Syrian President Bashar Al-Assad.[4]  Rep. Gabbard has used her official Twitter account to make statements supportive of Russian military action in Syria and critical of American military action in Syria.[5]  In 2019, several major media outlets, including *NBC*, *The Atlantic*, and the *New York Times*, reported that Russian media and social media were promoting Rep. Gabbard's candidacy.[6]

---

[3]  Ex. 2, Tulsi2020 Website excerpt, "Meet Tulsi Gabbard," *available at* https://www.tulsi2020.com/about.

The Court may take judicial notice of statements by government officials on their official social media pages and in official press releases.  *Christa McAuliffe Intermediate Sch. PTO*, 364 F. Supp. 3d at 263 (taking judicial notice of statements by New York Mayor de Blasio in a press release and via his official Twitter account because the fact that he made the statements "'can be accurately and readily determined' from a source 'whose accuracy cannot reasonably be questioned'"); *see also Hawaii v. Trump*, 859 F.3d 741, 773 n.14 (9th Cir.), *vacated on other grounds*, 138 S. Ct. 377 (2017) (taking judicial notice of President Trump's statement made via Twitter).

[4]  Ex. 3, Congresswoman Tulsi Gabbard Website, Press Release (Jan. 25, 2017), *available at* https://gabbard.house.gov/news/press-releases/congresswoman-tulsi-gabbard-returns-syria-renewed-calls-end-regime-change-war.

[5]  Ex. 4 at 3–4, @TulsiGabbard Twitter account excerpts (*compare* "[b]ad enough US has not been bombing al-Qaeda/al-Nusra in Syria.  But it's mind boggling that we protest Russia's bombing of these terrorists," (Oct. 1, 2015) *with* "[t]ime to end the illegal, counterproductive war to overthrow the Syrian government of Assad" (Nov. 2, 2016)), *available at* https://twitter.com/TulsiGabbard.

[6]  *See* Ex. 5 at 1–2, Robert Windrem & Ben Popken, *Russia's propaganda machine discovers 2020 Democratic candidate Tulsi Gabbard*, NBC News, Feb. 2, 2019 ("An NBC News analysis of the main English-language news sites employed by Russia in its 2016 election meddling shows Rep. Tulsi Gabbard . . . has become a favorite of the sites Moscow used when it interfered in 2016 . . . .  All three sites . . . defended her positions on Russia and her 2017 meeting with Syrian President Bashar Al-Assad"); Ex. 6 at 3, Edward-Isaac Dovere, *The Enduring Mystery of Tulsi Gabbard*, The Atlantic, Sept. 5, 2019 ("RT, the Kremlin-backed news agency, often highlights Gabbard's campaign.  The Russian embassy in South Africa has tweeted defensively about her, Russian bots have boosted her . . ."); Ex. 7, Lisa Leher, *Left Scratches its Head and Far Right Swoons at Gabbard Campaign:  As she injects chaos into the 2020 Democratic primary by accusing her own*

On October 13, 2019, the *New York Times* reported that "the D.N.C. is well aware of the frequent mentions of Ms. Gabbard in the Russian state news media" and that a Twitter hashtag "that trended among Ms. Gabbard's supporters . . . appeared to be amplified by a coordinated network of bot-like accounts."  Ex. 7 at 2.  Rep. Gabbard responded during the October 15, 2019 Democratic Debate, saying, "the *New York Times* and *CNN* have also smeared veterans like myself for calling for an end to this regime change war.  Just two days ago, the *New York Times* put out an article saying that I'm a Russian asset and an Assad apologist and all these different smears."[7]

Two days later, on October 17, 2019, Secretary Clinton was a guest on the podcast of President Barack Obama's former campaign manager, David Plouffe, *Campaign HQ With David Plouffe* (hereinafter, "the podcast").  Am. Compl. ¶ 17.  David Plouffe introduced his interview with Secretary Clinton by describing her "unique perspective" on issues relating to impeachment, the presidential election, and campaigning against Donald Trump.  Ex. 1, Audio Recording, *Campaign HQ With David Plouffe* at 0:00–1:45, Oct. 17, 2019.[8]  He explained, "I wanted to spend a little time with her given where we are in the race with impeachment looming over that and the

---

*party of 'rigging' the election, an array of alt-right internet stars, white nationalists and Russians have praised her*, N.Y. Times, Oct. 13, 2019, at A.20.

"[C]ourts considering a motion to dismiss may 'take judicial notice of the fact that press coverage contained certain information' so long as they do not rely on the 'truth' of that information."  *N.J. Carpenters Health Fund v. Royal Bank of Scot.*, 709 F.3d 109, 127 n. 11 (2d Cir. 2013) (alteration omitted) (quoting *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008)).

[7] *See* Ex. 8, *The October Democratic Debate Transcript*, Wash. Post, Oct. 16, 2019, at 18; *see also* Tulsi Gabbard YouTube video, "Watch the 6 minutes that has America searching Tulsi Gabbard" (Oct. 15, 2019), *available at* https://www.youtube.com/watch?v=f7-9qF0sMyk.

[8] The Court may properly consider the complete publication at issue, which is integral to the complaint and incorporated into the complaint by reference.  *See Tellabs, Inc.*, 551 U.S. at 322; *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).  This audio recording is being submitted to the Court on a CD as Exhibit 1, and is also publicly available on podcast platforms (*see, e.g.*, https://www.stitcher.com/podcast/cadence13/campaign-hq-with-david-plouffe/e/64659318).

country, and just get her sense of what we are going to need to beat Donald Trump in 2020, from her very unique vantage point . . . . in addition to her thoughts on foreign interference, both as related to her race in 2016 and sadly what we have to look forward to in 2020." *Id.*

During the interview, Secretary Clinton and Plouffe discussed President Trump and the Republican Party's strategy in 2016, and their opinions on that party's likely 2020 strategy. Plouffe observed that "one of the reasons he [Trump] was able to win is the third party vote," and that "he's going to try and drive the people not to vote for him but just to say, 'you know, you can't vote for them either.' And that seems to be, I think, to the extent that I can define a strategy, their key strategy right now." Ex. 1 at 32:40–33:50. The conversation continued:

> Clinton: Well, I think there's going to be two parts and I think it's going to be the same as 2016: Don't vote for the other guy. You don't like me? Don't vote for the other guy because the other guy is going to do X, Y and Z or the other guy did such terrible things and I'm going to show you in these, you know, flashing videos that appear and then disappear and they're on the dark web, and nobody can find them, but you're going to see them and you're going to see that person doing these horrible things.
>
> They're also going to do third party again. And I'm not making any predictions but I think they've got their eye on somebody who is currently in the Democratic primary and are grooming her to be the third party candidate. **She's the favorite of the Russians. They have a bunch of sites and bots and other ways of supporting her so far, and that's assuming Jill Stein will give it up. Which she might not, because she's also a Russian asset.**
>
> Plouffe: (Inaudible)
>
> Clinton: **Yeah, she's a Russian asset**, I mean, totally. And so, they know they can't win without a third party candidate and, so, I don't know who it's going to be but I will guarantee you they'll have a vigorous third party challenge in the key states that they most need it.

Ex. 1 at 33:50–35:00 (emphasis added to allegedly defamatory statements (*see* Am. Compl. ¶ 17)).

The following day, on October 18, Rep. Gabbard responded via Twitter:

> Great!   Thank you @HillaryClinton.   You, the queen of
> warmongers, embodiment of corruption, and the personification of
> the rot that has sickened the Democratic Party for so long, have
> finally come out from behind the curtain.  From the day I announced
> my candidacy, there has been a concerted campaign to destroy my
> reputation.  Now we know – it was always you, through your proxies
> and powerful allies in the corporate media and war machine, afraid
> of the threat I pose.  It's now clear that this primary is between you
> and me.  Don't cowardly hide behind your proxies.  Join the race
> directly.

Ex. 4 at 1.  Asked by CNN if Secretary Clinton was referring to Rep. Gabbard in her remarks,

which did not refer to Rep. Gabbard by name, Clinton spokesman Nick Merrill only provided the

non-response, "[i]f the nesting doll fits."  Am. Compl. ¶ 21.

On October 19 and 20, Rep. Gabbard used Secretary Clinton's statements in fundraising

messages to her supporters.  Ex. 4 at 2 & Ex. 9, Twitter excerpts and linked fundraising request

("Hillary & her gang of rich, powerful elite are going after me to send a msg to YOU: 'Shut up,

toe the line, or be destroyed.' But we, the people, will NOT be silenced;" "Will you chip-in right

now to take a stand?"); Ex. 10 ("We must not let Hillary Clinton and her establishment allies

silence the voice of the American people. . . . Rush donate $25 now").  Thereafter, on January 22,

2020, Rep. Gabbard filed her complaint, alleging defamation and seeking at least $100 million in

damages.  Secretary Clinton moved to dismiss the complaint on March 13, 2020.  Rep. Gabbard

suspended her presidential campaign on March 19, 2020.  Am. Compl. ¶ 11.  On March 31, 2020,

Plaintiffs filed an amended complaint.  ECF No. 23; *see* Ex. 11 (document reflecting changes to

the complaint in redline).

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009) (internal quotation marks omitted).  "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do," nor will "naked assertions devoid of further factual enhancement." *Id.* (brackets and quotation marks omitted). In addition, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (quotation marks omitted). Rather, there must be "well-pleaded factual allegations." *Id.* at 679.

## ARGUMENT

In defamation cases such as this one, courts recognize that vigilant use of motions to dismiss is "essential" in preventing "long and expensive litigation" that would "thwart[]" the "protective purpose of the First Amendment . . . even if the defendant ultimately prevails." *Farah v. Esquire Mag.*, 736 F.3d 528, 534 (D.C. Cir. 2013) (internal quotation marks omitted); *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016). The First Amendment "greatly restrict[s] the common law where the defendant is a member of the press, the plaintiff is a public figure, or the subject matter of the supposed libel touches on a matter of public concern." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1091–92 (4th Cir. 1993) (citation and footnote omitted). And the court's gatekeeping function must be performed at the outset because "unlike in most litigation, in a libel suit the central event—the communication about which suit has been brought—is ordinarily before the judge at the pleading stage." 2 Robert D. Sack, *Sack on Defamation* § 16:2:1, at 16-3 to -4 (5th ed. 2017).

"[D]ebate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression." *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (per curiam). In defamation actions arising out of political debate, where the plaintiff is a public figure and the matter is of public concern, "the interpretation of what is libelous must also be measured very carefully

7

because . . . public officials and public figures have sufficient access to the means of counter-argument to be able 'to expose through discussion the falsehood and fallacies' of the defamatory statements." *Buckley v. Littell*, 539 F.2d 882, 890 (2d Cir. 1976) (citation omitted) (quoting *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 155 (1967)); *see also N.Y. Times Co.*, 376 U.S. at 270.  "Our Constitution . . . contemplates a bias toward unfettered speech at the expense, perhaps, of compensation for harm to reputation, at least where a public figure and a topic of enormous public interest, going to the heart of political discourse, is concerned." *Littell*, 539 F.2d at 889.  "Those who step into areas of public dispute, who choose the pleasures and distractions of controversy, must be willing to bear criticism, disparagement, and even wounding assessments." *Ollman v. Evans*, 750 F.2d 970, 993 (D.C. Cir. 1984) (Bork, J., concurring).  These principles guide the analysis of whether Plaintiffs have stated the elements of a defamation claim.

As set forth below, Plaintiffs fail plausibly to allege several of those elements.  First, "[o]nly factual statements are actionable as defamation or libel," *Chau v. Lewis*, 771 F.3d 118, 128 (2d Cir. 2014), but the statements at issue are opinion, not fact.  Second, although "[i]t is essential in making out a prima facie case in libel to prove that the matter is published of and concerning the plaintiff," *Julian v. Am. Bus. Consultants, Inc.*, 137 N.E.2d 1, 11 (N.Y. 1956), Plaintiffs fail to do so.  Third, Plaintiffs do not plausibly allege that Secretary Clinton acted with "actual malice"—that is, with "knowledge that [the publication] was false or with reckless disregard of whether it was false or not." *N.Y. Times Co.*, 376 U.S. at 279–80.  These failures require dismissal.

I.   **"Favorite of the Russians" and "Russian Asset" Are Non-Actionable Statements of Opinion**

The statements at issue—"favorite of the Russians" and "Russian asset" —cannot support a claim for defamation because both are "statement[s] of opinion relating to matters of public concern which do[] not contain a provably false factual connotation." *Milkovich v. Lorain Journal*

8

*Co.*, 497 U.S. 1, 17–22 (1990).  These statements "receive full constitutional protection," as the First Amendment shelters "vigorous epithet," "rhetorical hyperbole," and other "loose, figurative" language that cannot reasonably be understood to convey facts about the plaintiff.  *Id.* at 20–21.

The First Amendment also shelters "political labels" that "cannot be regarded as having been proved to be statements of fact . . . because of the tremendous imprecision of the meaning and usage of these terms in the realm of political debate."  *Littell*, 539 F.2d at 893–94 (holding that the use of political labels "fascist," "fellow traveler" and "radical right" are "protected opinion" because they "are concepts whose content is so debatable, loose and varying, that they are insusceptible to proof of truth or falsity"); *see also Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 284 (1974) ("to use loose language or undefined slogans that are part of the conventional give-and-take in our economic and political controversies—like 'unfair' or 'fascist'—is not to falsify facts"); *Greenbelt Coop. Publ'g Ass'n, Inc. v. Bresler*, 398 U.S. 6, 14 (1970) (holding that newspaper's use of the term "blackmail" to describe plaintiff's negotiating tactics in heated city council meetings was not actionable); *Egiazaryan v. Zalmayev*, 880 F. Supp. 2d 494, 508 (S.D.N.Y. 2012) (holding that use of "friend" to describe political associations is "too vague, and the relationship it describes too immune to proof, to be an expression of fact"); *Wood v. AFGE*, 316 F. Supp. 3d 475, 488 (D.D.C. 2018), *aff'd*, No. 18-7124, 2019 WL 668337 (D.C. Cir. Feb. 12, 2019) (holding that use of the words "gang member" and "crook" to describe plaintiff was non-actionable hyperbole, and not meant literally); *Koch v. Goldway*, 817 F.2d 507, 509–10 (9th Cir. 1987) (holding that suggestion that plaintiff was "Nazi war criminal" in heated political debate was mere rhetoric); *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 626 (D.C. Cir. 2001) (holding that the term "paranoia" in political magazine to describe the attitude of a political leader constituted protected, unverifiable comment).  "When insults occur

during political disputation, courts are particularly likely to dismiss them as nonactionable epithets, both because they probably will be understood that way and in order to insure protection of vigorous political speech." *Sack on Defamation*, § 2:4.7, at 2-54.

New York law is even "broader and more protective of speech" on this point than the First Amendment and "provides for absolute protection of opinions." *Michel*, 816 F.3d at 695 (applying New York law). "[O]nly factual statements are actionable as defamation or libel," and "[d]etermining whether a statement is an allegation of fact or mere opinion is a legal question for the court." *Chau*, 771 F.3d at 128. New York courts consider "three factors in determining whether a reasonable reader would consider the statement [to] connote[] fact or nonactionable opinion": (1) "whether the specific language in issue has a precise meaning which is readily understood"; (2) "whether the statements are capable of being proven true or false"; and (3) "whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal . . . readers or listeners that what is being read or heard is likely to be opinion, not fact." *Davis v. Boeheim*, 22 N.E.3d 999, 1005 (N.Y. 2014). The inquiry requires a "holistic approach"—"[r]ather than sifting through a communication for the purpose of isolating and identifying assertions of fact, the court should look to the over-all context in which the assertions were made and determine on that basis whether the reasonable reader would have believed that the challenged statements were conveying facts about the . . . plaintiff." *Id.* (internal quotation marks omitted). A "statement of opinion which is accompanied by a recitation of the facts upon which it is based or does not imply that it is based on undisclosed facts" is non-actionable "pure opinion." *Chau*, 771 F.3d at 128–29 (internal quotation marks omitted).

The context of Secretary Clinton's statements—a political podcast about the presidential election, on which Secretary Clinton was a guest commentator—supports the conclusion that her statements were opinion.  *See Immuno AG v. Moor-Jankowski*, 567 N.E.2d 1270, 1280–1281 (N.Y. 1991).  Like a letter to the editor, *id.*, a magazine for political commentary, *see Weyrich*, 235 F.3d at 625, a radio call-in talk show, *see National Ass'n of Gov't Emps. v. Cent. Broad. Corp.*, 396 N.E.2d 996, 1001 (Mass. 1979), or an Op-Ed page, *see Ollman*, 750 F.2d at 985, a political podcast is a setting that "suggests, among other factors, that the statement[s] would be understood by the reasonable [listener] as opinion," *id.*  And even though the podcast itself was "not confrontational" and Secretary Clinton spoke with a "calm, serious, factual tone," Am. Compl. ¶ 20, the broader context of the podcast was the heated political debate of the 2020 presidential election.  *See Koch v. Goldway*, 817 F.2d 507, 508–09 (9th Cir. 1987) (concluding that the "surrounding circumstances" were "a heated political debate" where the defendant made a statement at a private event commenting on an earlier statement by the plaintiff).

Moreover, the podcast's host, David Plouffe, used "cautionary language" signaling to his listeners that his interview with Secretary Clinton contained her opinions—"her thoughts" on election interference, "her sense" of the 2020 election, based on her "unique perspective" and "very unique vantage point." Ex. 1 at 0:00–1:45.  And Secretary Clinton signaled that she was speaking her opinion by starting her thought with "I'm not making any predictions but I think . . . ." *Id.* at 34:15.  "By giving weight on the opinion side of the scale to cautionary and interrogative language" like the cautionary signals present here, "courts provide greater leeway to . . . commentators in bringing issues of public importance to the public's attention and scrutiny." *Ollman*, 750 F.2d at 983.

In this context—a political podcast about the upcoming presidential election—the statements "favorite of the Russians" and "Russian asset" cannot support a claim for defamation because they are "loose, figurative" statements, incapable of being proven true or false. *See Milkovich*, 497 U.S. at 21. They are "subjective opinion[s]," as opposed to "empirical determination[s] subject to verification." *Michel*, 816 F.3d at 697. The issue of "favorites" is inherently subjective, and whether someone is the favorite candidate of a foreign government cannot be objectively proven in court. Similarly, the statement that someone is a "Russian asset" does not have a definite meaning—it is a loose, figurative expression not susceptible to proof. It is like the allegedly defamatory statement in *Egiazaryan*, in which one politician was described as the "friend" of another. *See* 880 F. Supp. 2d at 508. There, this Court concluded that, "[l]ike the phrase 'fellow traveler,' the word 'friend,' when used to describe the relationship of one prominent politician to another prominent politician with whom he has some association, has a meaning too 'debatable, loose, and varying,' to be proven." 880 F. Supp. 2d at 508 (citation omitted). Even if Secretary Clinton had explicitly called Rep. Gabbard a "traitor"—a meaning that Rep. Gabbard incorrectly argues was implicit in the "Russian asset" political label, Am. Compl. ¶ 34—the Supreme Court has held that the epithet "traitor" could not "be construed as [a] representation[] of fact" when used in the thick of a labor dispute. *Austin*, 418 U.S. at 284.

Rep. Gabbard herself has demonstrated that the phrase "Russian asset" has a loose and varying meaning in the current political debate. In this lawsuit, Plaintiffs allege that the phrase is a "serious charge[]" that "Tulsi is a tool of, and perhaps an agent of, the United States's geopolitical rival Russia." Am. Compl. ¶ 31.[9] And yet a mere two days before Secretary Clinton used the

---

[9] Plaintiffs further allege that Clinton's statements meant "that Tulsi was aligned with Russia—not the United States—and would act to further Russia's interests in this presidential election," as

phrase "Russian asset," Gabbard herself used this phrase during the televised Democratic Debate to characterize reporting by the *New York Times* about "supportive signs [for Rep. Gabbard] from online bot activity and the Russian news media." *See supra* p. 4 & n. 7; Exs. 7–8. The *New York Times* did not print the phrase "Russian asset," nor did it report that Rep. Gabbard is a tool or agent of Russia—but Rep. Gabbard chose that phrase to state her disagreement with the article, complaining that "the *New York Times* put out an article saying that I'm a Russian asset." Ex. 8. Rep. Gabbard herself thus recognized that "Russian asset" can be used to describe a political candidate who, for one reason or another, the Russian government seems to prefer. Its potential meaning is not limited to that which Rep. Gabbard now alleges in her complaint. *See* Am. Compl. ¶¶ 31–35. Here, "Russian asset" is, like the terms "fascist," "fellow traveler," and "friend," a political label that is protected opinion because its meaning is debatable, loose, varying, and insusceptible to proof of truth or falsity. *See Littell*, 539 F.2d at 893–94; *Egiazaryan*, 880 F. Supp. 2d at 508.

Secretary Clinton's statements, moreover, qualify as "pure opinion" because they were accompanied by a recitation of the facts upon which they were based and did not imply that they were based on any undisclosed facts. *See Chau*, 771 F.3d at 128–29. With respect to the statement "[s]he's the favorite of the Russians," Secretary Clinton explained: "They have a bunch of sites and bots and other ways of supporting her so far."[10] Am. Compl. ¶ 17. And even assuming the term "Russian asset" was referring to the same person—as opposed to Jill Stein, as is clear from

_____

well as that "Tulsi was assisting the Russians . . . potentially even as a Russian agent and traitor to this country." Am. Compl. ¶¶ 33–34.

[10] Although Plaintiff's identification of the alleged defamatory statements includes the sentence about "sites and bots supporting her," Am. Compl. ¶ 17, Plaintiffs' complaint is devoid of any allegations specifying that this statement is false, *see* Am. Compl. ¶¶ 30–40.

the context (*see* Part II, *infra*)—it could only reasonably be read as an opinion based on the same facts—someone who is supported by Russian sites and bots. These pure opinions, based on disclosed facts, are non-actionable. *Chau*, 771 F.3d at 128–29; *Levin v. McPhee*, 119 F.3d 189 (2d Cir. 1997) (affirming dismissal where facts were disclosed and allegedly defamatory statements, read in context, signaled to the reader that they were opinion, not fact).

Secretary Clinton's commentary was made during a political podcast, and related to Russia's support for presidential candidates. *See* Exs. 1–7. Rep. Gabbard may disagree with Secretary Clinton's views, but as a member of Congress and then-candidate for President, Rep. Gabbard "ha[s] sufficient access to the means of counter-argument to be able 'to expose through discussion'" any disagreements with Secretary Clinton's statements. *Littell*, 539 F.2d at 890. It is clear that Rep. Gabbard has used her platform to do so—she has publicly decried Secretary Clinton's statements, accused Clinton of being a "corrupt[]" "warmonger[]" while doing so, and invoked Secretary Clinton's statements to solicit campaign contributions. Exs. 4, 9, 10.

As Judge Bork observed, in the context of an "intense political campaign," with its "highly charged atmosphere," "many cruel and damaging things" may be said about political candidates, but "we would be astonished and highly disapproving if the defamed candidate brought an action for libel," because "[w]e expect people who engage in controversy to accept that kind of statement as their lot." *Ollman*, 750 F.2d at 1005 (Bork, J., concurring). "We think the first amendment demands a hide that tough." *Id.* Rep. Gabbard's complaint violates the First Amendment and fails to state a claim under New York law, and thus requires dismissal.

## II.   Plaintiffs Fail To Satisfy the "Of and Concerning" Requirement

To state a claim for defamation, Plaintiffs must plead and prove that the publication at issue is actually about them—a constitutional and common law rule known as the "of and concerning" requirement. *Chau*, 771 F.3d at 129. Under the First Amendment, the only party entitled to assert

14

a claim for defamation is the party at whom the allegedly false statements were "**specifically directed**." *Rosenblatt v. Baer*, 383 U.S. 75, 81–82 (1966) (emphasis added); *N.Y. Times Co.*, 376 U.S. at 288–89.  This requirement "should ordinarily be resolved at the pleading stage." *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173 (2d Cir. 2001).

The key statement at issue—"she's a Russian asset"—which does not mention either Rep. Gabbard or Tulsi Now by name—does not satisfy the requirement that it be "of and concerning" either Plaintiff.  The pronoun "she," in context, is logically read as referring to Jill Stein, who is identified as the subject in the preceding sentence.  *See* Am. Compl. ¶ 17 (". . . . that's assuming Jill Stein will give it up.  Which she might not, because she's also a Russian asset.  Yeah, she's a Russian asset.); *see also N.Y. Times Co.*, 376 U.S. at 288 (holding that the allegedly defamatory statements were not "of and concerning" the plaintiff where "[t]here was no reference to respondent in the advertisement, either by name or official position," and the statements "did not on their face make even an oblique reference to respondent as an individual").  Although Rep. Gabbard has asserted that Secretary Clinton was referring to Rep. Gabbard with the "Russian asset" remark, and Rep. Gabbard herself has imposed that interpretation on Secretary Clinton's words via Twitter and other channels, *see* Ex. 4, the text of the statement is what matters, and the allegedly defamatory words plainly do not refer to Rep. Gabbard.  Thus Rep. Gabbard's defamation claim arising out of this statement requires dismissal.

Moreover, none of the statements—all of which employ the feminine personal pronouns "she" or "her"—can plausibly be understood as referring to the corporation Tulsi Now, Rep. Gabbard's campaign committee.  *See* Am. Compl. ¶¶ 6, 17.  Even after amending the complaint, Plaintiffs still fail to allege that listeners would have understood Secretary Clinton to be referring to Rep. Gabbard's corporate campaign committee.  The complaint alleges only that "[f]or the

purposes of Tulsi Gabbard's presidential campaign, Tulsi Gabbard and Tulsi Now are essentially synonymous and operate in sync," and that "Gabbard cannot run for office without Tulsi Now, as Tulsi Now is the entity required for receiving, processing, and handling all contributions to her presidential campaign."  Am. Compl. ¶ 6.  These allegations are insufficient.  Corporations and their leadership are not interchangeable, and one or the other may not bring defamation claims unless the statement is "understood by a reasonable reader as being, in substance, actually about [the plaintiff bringing suit]."  *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 398–99 (2d Cir. 2006); *see also Adirondack Record v. Lawrence*, 202 A.D. 251, 255 (N.Y. App. Div. 1922) ("A corporation cannot maintain an action for slander or libel upon words spoken or published solely of and concerning its officers or members."); *Carlucci v. Poughkeepsie Newspapers, Inc.*, 442 N.E.2d 442, 443 (N.Y. 1982) (holding as a matter of law that publication was not "of and concerning" an unnamed corporation associated with the named owner of the corporation); *Afftrex, Ltd. v. Gen. Elec. Co.*, 161 A.D.2d 855, 856 ( N.Y. App. Div. 1990).  Having failed even to allege that listeners would have understood Secretary Clinton's statements to be about Tulsi Now, and because a reasonable listener would not have understood her statements to be about Rep. Gabbard's corporate campaign committee, Tulsi Now's defamation claim requires dismissal.

## III.   Plaintiffs Fail To Allege That Secretary Clinton Acted with "Actual Malice"

The complaint must be dismissed for the additional reason that Plaintiffs fail plausibly to allege that Secretary Clinton spoke with "actual malice"—that is, with knowledge that her statements were false or with reckless disregard of whether they were false or not.  *N.Y. Times Co.*, 376 U.S. at 279–80.  A defamation suit may be dismissed for failure to state a claim where, as here, plaintiff has not pled facts sufficient to give rise to a reasonable inference of actual malice.  *See Biro v. Conde Nast,* 807 F.3d 541, 544–45 (2d Cir. 2015).

16

The actual malice standard was designed to protect erroneous statements made during free debate on matters of public concern, recognizing that freedom of expression needs "breathing space" to survive. *N.Y. Times Co.*, 376 U.S. at 271–72. The actual malice standard is not one of negligence, or even gross negligence. *See Garrison v. Louisiana*, 379 U.S. 64, 79 (1964). Although the actual malice standard uses the language of "reckless disregard," "reckless conduct is not measured by whether a reasonably prudent man would have published." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Id.*; *see also Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 688 (1989) (the standard requires a "high degree of awareness of probable falsity"). "Despite its name, the actual malice standard does not measure malice in the sense of ill will or animosity, but instead the speaker's subjective doubts about the truth of the publication." *Church of Scientology*, 238 F.3d at 174; *see also Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 510 (1991). This is a deliberately demanding standard, as "the basic question for determination by the court is: Did the defendant lie?" *Sack on Defamation* § 5:5.1, at 5–79.

As a Congresswoman and presidential candidate suing over campaign commentary, Rep. Gabbard is a textbook public figure. The Supreme Court has instructed that "it is abundantly clear that . . . publications concerning candidates must be accorded at least as much protection under the First and Fourteenth Amendments as those concerning occupants of public office." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 271 (1971). "Public discussion about the qualifications of a candidate for elective office presents what is probably the strongest possible case for application of the *New York Times* rule." *Ocala Star-Banner Co. v. Damron*, 401 U.S. 295, 300–01 (1971).

17

Plaintiffs allege that actual malice is demonstrated by "Clinton's ill will against Tulsi," which allegedly arises out of Rep. Gabbard's support for Bernie Sanders in 2016.  *See* Am. Compl. ¶¶ 47–50.  But "the actual malice standard is not satisfied merely through a showing of ill will." *Harte-Hanks Commc'ns*, 491 U.S. at 666.  "Debate on public issues will not be uninhibited if the speaker must run the risk that it will be proved in court that he spoke out of hatred."  *Greenbelt Coop. Publ'g Ass'n*, 398 U.S. at 10–11 (holding that it was "error of constitutional magnitude" for the trial court to instruct the jury that spite and hostility could be considered).  These allegations of ill will are insufficient to give rise to a plausible inference of actual malice.

Plaintiffs also allege that actual malice is demonstrated by Secretary Clinton's failure to retract her statements upon demand.  Am. Compl. ¶ 46.  This too is insufficient to create a plausible inference of actual malice.  "[A] defendant's decision not to retract . . . is not in itself enough to nudge an allegation of actual malice from conceivable to plausible."  *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 282 (S.D.N.Y. 2013), *aff'd*, 807 F.3d 541 (2d Cir.), *and aff'd*, 622 F. App'x 67 (2d Cir. 2015).  This is primarily because "its probative value as to a defendant's state of mind at the time of publication is dubious at best," *id.* at 281, but also because a failure to retract can evidence the publisher's belief that the statement was not defamatory, *N.Y. Times Co.*, 376 U.S. at 286–87; *Connelly v. Nw. Publ'ns, Inc.*, 448 N.W.2d 901, 905 (Minn. Ct. App. 1989).

Plaintiffs' other allegations concerning actual malice assume that the meaning of "Russian asset" is that Rep. Gabbard literally is an agent of the Russian government.  *See* Am. Compl. ¶¶ 43–45.  As addressed *supra*, Part I, "Russian asset" is a "loose, figurative" political label that is insufficiently factual to be proven false, and as addressed *supra*, Part II, "Russian asset" does not refer to Rep. Gabbard.  However, even accepting arguendo that "Russian asset" could be construed as a factual statement implying that Rep. Gabbard is literally an agent of Russia, a defendant "is

not liable for a defamatory innuendo unless [she] intended or endorsed that inference." *Chaiken v. VV Publ'g Corp.*, 907 F. Supp. 689, 698 (S.D.N.Y. 1995) (citing *Chapin*, 993 F.2d at 1093); *see also White v. Fraternal Order of Police*, 909 F.2d 512, 520 (D.C. Cir. 1990). Plaintiffs do not plausibly allege that Secretary Clinton intended such an implication, nor can they, in light of Secretary Clinton's inclusion of the explanatory facts "they have a bunch of sites and bots and other ways of supporting her so far," Ex. 1—facts that do not imply that the person referenced is literally a Russian agent, and instead only suggest that Russia has shown support for the person referenced. *See Church of Scientology*, 238 F.3d at 175 (holding that, under the subsidiary meaning doctrine, a statement is non-actionable when it merely expresses the same view as other statements found to have been published without actual malice). For example, Plaintiffs allege that the fact that Secretary Clinton has never "report[ed] Tulsi to law enforcement" demonstrates Secretary Clinton's knowledge that Rep. Gabbard is not a Russian agent, Am. Compl. ¶ 43—but the far more logical conclusion is that Secretary Clinton did not intend to imply that Rep. Gabbard is a Russian spy in the first place and was only expressing that Rep. Gabbard seemed to be the favorite candidate of the Russians. Plaintiffs' remaining conclusory allegations, *see* Am. Compl. ¶ 41, are insufficient, *see Biro*, 807 F.3d at 544–47.

Plaintiffs do not, and cannot, plausibly allege that Secretary Clinton had a "high degree of awareness of probable falsity" of the facts she stated—that the Russians "have a bunch of sites and bots and other ways of supporting [Rep. Gabbard] so far." *Harte-Hanks Commc'ns*, 491 U.S. at 687 (alteration and internal quotation marks omitted); Am. Compl. ¶ 17. Even after amending their complaint in response to Secretary Clinton's motion to dismiss, Plaintiffs still do not specifically allege that these facts—about Russian sites and bots supporting Rep. Gabbard—are false. And that statement was consistent with information that had been recently reported by

reputable news sources. *See* Ex. 5 (*NBC*); Ex. 6 (*The Atlantic*); Ex. 7 (*The New York Times*). The existence of other published, corroborating statements undermines any inference of actual malice. *See Liberty Lobby, Inc. v. Rees*, 852 F.2d 595, 599 (D.C. Cir. 1988) (noting that "'defamation defendants will not be forced to defend . . . the truthfulness of previous reports made by independent publishers.'").

To the extent that Secretary Clinton's statements contained facts, in the absence of any plausible allegations that Secretary Clinton harbored subjective doubt as to the truth of her statements, the complaint requires dismissal. *See Biro*, 807 F.3d at 544–45.

## CONCLUSION

For the foregoing reasons, Secretary Clinton respectfully requests that this Court dismiss with prejudice Plaintiffs' claim for defamation. Dismissal with prejudice is warranted because Plaintiffs have already once amended their defamation claim in response to Secretary Clinton's arguments. Any further opportunity to amend would be futile.[11]

Dated: April 7, 2020

Respectfully submitted,

*s/ David E. Kendall*
David E. Kendall (Bar No. DK8983)
Katherine M. Turner (*pro hac vice*)
Amy Mason Saharia (*pro hac vice*)
Gloria K. Maier (*pro hac vice*)

WILLIAMS & CONNOLLY LLP
725 Twelfth Street N.W.
Washington, DC 20005

---

[11] *See Church of Scientology Int'l v. Time Warner, Inc.*, 1998 WL 575194, at *5 (S.D.N.Y. Sept. 9, 1998), *aff'd sub nom. Church of Scientology Int'l v. Behar*, 238 F.3d 168 (2d Cir. 2001) (denying leave to amend complaint for defamation because any amendment would be futile in light of applicable First Amendment considerations).

650 Fifth Avenue
Suite 1500
New York, NY 10019
Tel: (202) 434-5000
Fax: (202) 434-5029
dkendall@wc.com

*Attorneys for Hillary Rodham
Clinton*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 7, 2020, I caused to be filed electronically the foregoing Defendant Hillary Rodham Clinton's Memorandum Of Law In Support Of Her Motion To Dismiss The First Amended Complaint For Failure To State A Claim with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record in this matter who are on the CM/ECF system.

<u>*s/ David E. Kendall*</u>
David E. Kendall
